



FILED

Sep 08 2020, 12:16 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 20S-CT-548

## Patrick Humphrey,
*Appellant,*

−v−

## Brian Tuck, US Xpress, Inc.,
*Appellees.*

---

Argued: May 21, 2020 | Decided: September 8, 2020

Appeal from the Jackson Superior Court
No. 36D01-1604-CT-22
The Honorable AmyMarie Travis, Judge

On Petition to Transfer from the Indiana Court of Appeals
Case No. 19A-CT-721

---

### Opinion by Justice Slaughter

Chief Justice Rush and Justices David, Massa, and Goff concur.

**Slaughter, Justice.**

The amount of evidence necessary for a court to instruct a jury on a mitigation-of-damages defense is minimal, requiring only a "scintilla". This stands in contrast to the preponderance-of-the-evidence standard required to prevail on the defense. Here, there was enough evidence to support giving the challenged instruction. We grant transfer and affirm the trial court.

I

In early February 2016, plaintiff, Patrick Humphrey, was driving from Georgia to Iowa to start a new job. While he was traveling through Indiana, a tractor-trailer sideswiped Humphrey's rental car, and he hit his head against his car's window. Defendant Brian Tuck, a driver for defendant US Xpress, Inc., was behind the wheel of the tractor-trailer and kept driving after the contact. Humphrey eventually flagged Tuck down, and they exchanged information and called police. When the officer arrived, he asked whether Humphrey was injured and needed assistance. Humphrey said no. He then resumed his trip to Iowa. As he was driving, Humphrey felt something in his left eye but thought it was dust.

After arriving in Iowa, Humphrey experienced more severe eye irritation and, while washing out his eye, pulled out a sliver of glass. His vision changed the next day, and he went to a local hospital. There, he was referred to an ophthalmologist, who recommended an MRI of his brain. The MRI showed a tumor on his pituitary gland, and the ophthalmologist warned that Humphrey would go blind if he did not have the tumor "taken care of". Humphrey then returned home to Georgia by bus.

In late February, Humphrey consulted a neurosurgeon, Dr. John Vender, about the tumor, headaches, and worsening vision. Vender said the tumor was a prolactinoma, a non-cancerous tumor of the pituitary gland that secretes the hormone prolactin. Vender also said that Humphrey had a pituitary apoplexy, a rapid increase in the size of a pre-existing tumor, often triggered by a sudden event and caused by bleeding into the tumor. Vender recommended surgery and removed the tumor.

Four months later, Humphrey met with an endocrinologist, Dr. Maximillian Stachura, because Humphrey had symptoms of a hormonal imbalance. The imbalance was due to Humphrey's low level of testosterone and his high level of prolactin. A high amount of prolactin can cause or exacerbate testosterone-related issues—including weight gain, lethargy, and low sexual drive—so Stachura prescribed medicine, bromocriptine, to lower his prolactin level. But Humphrey could not initially afford to fill the prescription. Later, after he began taking it, two things happened: his prolactin level dropped, and he experienced significant nausea. Because of this side effect, Stachura told Humphrey to stop taking the medicine and to make an appointment to find a suitable alternative. But Humphrey never made the appointment. Instead, he waited over a year to start testosterone injections. Once he began the injections, his symptoms greatly improved.

Because of the accident and its aftermath, Humphrey sued Tuck and US Xpress. He alleged the accident caused a pre-existing tumor to swell in size and asserted legal theories based on negligence, negligence per se, and respondeat superior. At trial, liability was not an issue—Tuck and US Xpress admitted fault for the accident. The only issue was damages, and Tuck and US Xpress argued that Humphrey failed to mitigate them. To support their argument at trial, Tuck and US Xpress pointed to evidence that Humphrey did not initially take the medicine prescribed for him, that it worked when he did take it, that he stopped taking it because of side effects, that he did not immediately follow up as directed to find an alternative medicine, and that despite claiming vision problems, he failed to fill an eyeglasses prescription.

At the conclusion of evidence, Tuck and US Xpress asked for a jury instruction on failure to mitigate damages. Humphrey objected, arguing there was not enough evidence to justify giving the instruction. The trial court disagreed and instructed the jury:

> A plaintiff must use reasonable care to minimize his damages after he is injured. The Plaintiff may not recover for any item of damage that he could have avoided through the use of reasonable care. The Defendant has the burden of proving by

the greater weight of the evidence that the plaintiff failed to use reasonable care to minimize his damages. Do not consider failure to minimize damages as fault. Rather you may consider failure to minimize damages to reduce the amount of damages that the plaintiff claims.

The jury, so instructed, returned a verdict awarding Humphrey $40,000, and the trial court entered judgment on that verdict. Humphrey then filed a post-judgment motion to correct error, again arguing the mitigation instruction was unsupported by the evidence. The trial court denied the motion, and Humphrey appealed.

The court of appeals agreed with Humphrey. It noted that a failure-to-mitigate-damages defense has two elements. *Humphrey v. Tuck*, 132 N.E.3d 512, 516 (Ind. Ct. App. 2019), trans. granted. The first is that the plaintiff did not exercise reasonable care in mitigating post-injury damages. The second is that the plaintiff's lack of reasonable care caused him to suffer an identifiable harm not attributable to defendant's negligence. *Id*. The court of appeals found there was not sufficient evidence of the second element, so it reversed the trial court's decision on the jury instruction. And because the jury's verdict was general—making it impossible to know whether, or to what extent, the instruction affected the verdict—it ordered a new trial on damages. *Id*. at 516–17.

## II
## A

Trial courts generally enjoy considerable discretion when instructing a jury. *Wal-Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 893 (Ind. 2002). When a party challenges a trial court's decision to give or refuse a proposed jury instruction, a reviewing court considers three things:

- Does the instruction correctly state the law?
- Is the instruction supported by evidence in the record?
- Is the instruction's substance covered by other instructions?

*Id.* Only the first consideration is a legal question on which the trial court receives no deference. The other two are reviewed for an abuse of discretion. *Id.*

This case is about the second consideration: the amount of evidence needed to instruct the jury. We have set the evidentiary bar deliberately low because our constitution guarantees the right to a jury trial in both criminal and civil cases. Ind. Const. art. 1, §§ 13(a), 20. Consistent with these rights, "[a] party who makes a proper request is entitled to have an instruction based upon his own theory of the case if within the issues and there is **any evidence** fairly tending to support it." *Lavengood v. Lavengood*, 225 Ind. 206, 211, 73 N.E.2d 685, 687 (1947) (citing *Carpenter v. State*, 43 Ind. 371, 373 (1873)) (emphasis added). This "any evidence" standard applies to instructions for both claims and defenses. See *id.* at 210–12, 73 N.E.2d at 687 (discussing plaintiff's instructions to support his claim); *Indianapolis Horse Patrol, Inc. v. Ward*, 247 Ind. 519, 525, 217 N.E.2d 626, 629 (1966) (noting defendants' instructions to support their qualified-privilege defense).

For example, in *Hernandez v. State*, 45 N.E.3d 373 (Ind. 2015), a criminal case, we held it was reversible error for the trial court to refuse the defendant's proposed instruction on the defense of necessity. In describing the applicable evidentiary standard for instructing the jury, we referred interchangeably to the minimal requirements of "some" evidence and a "scintilla" of evidence.

> Thus, after reviewing the record, it appears that there is at least **some** evidence supporting each element of the necessity defense. Even if there is only a "**scintilla**" of evidence in support of a criminal defendant's proposed defense instruction, it should be left to the province of the jury to determine whether that evidence is believable or unbelievable.

*Id*. at 378 (emphasis added). A jury should hear a tendered instruction if the record, though "meager", contains "any facts or circumstances" pertinent to the case. *Reed v. State*, 141 Ind. 116, 122–23, 40 N.E. 525, 527 (1895). The reverse is also true. A trial court may refuse a jury instruction only when "[n]one of the facts" in the record would support the legal theory offered in the instruction. *Sims v. Huntington*, 271 Ind. 368, 373, 393 N.E.2d 135, 139 (1979).

Thus, under Indiana law, the party seeking an instruction need only produce some evidence—a "scintilla"—of each element of the underlying claim or defense. See, e.g., *id.* at 373, 393 N.E.2d at 139. There is an important symmetry here. No party—neither plaintiff nor defendant— need affirmatively prove its claim or defense before the trial court instructs the jury on the issue. The party need only point to some evidence in the record that when viewed most favorably would suffice for a reasonable juror to decide the issue in the party's favor.

B

We turn next to the affirmative defense at issue here—failure to mitigate damages. Our leading case on this defense is *Willis v. Westerfield*, 839 N.E.2d 1179 (Ind. 2006), a personal-injury case. There, we explained that tort plaintiffs must mitigate post-injury damages; otherwise, the damages they can recover are reduced "by those damages which reasonable care would have prevented." *Id.* at 1187 (citing *Kocher v. Getz*, 824 N.E.2d 671, 674 (Ind. 2005)). Thus, a plaintiff's failure to mitigate damages is not an affirmative defense to liability; it merely reduces the damages the plaintiff may recover. *Id.* In other words, the defense concerns not a defendant's liability but a claimant's actions or omissions that worsen the claimant's injuries. *Id*.

The defense has two elements, and to prevail the defendant must prove each element by a preponderance of the evidence. *Id*. at 1188. The first is that the plaintiff did not exercise reasonable care in mitigating post-injury damages. *Id*. The second is that the failure to exercise reasonable care caused the plaintiff to suffer harm beyond that attributable to the defendant's negligence. *Id*. When the defense is that the plaintiff did not follow medical advice, thus aggravating his own injuries, the defendant must prove the plaintiff's neglect caused him "to suffer a discrete, identifiable harm arising from that failure, and not arising from the defendant's acts alone." *Id*.

Proving such causation often will require expert medical testimony, but not always. *Id*. In *Willis*, we rejected a bright-line rule that would have required expert testimony across the board. Instead, we held that whether to give such a failure-to-mitigate instruction must be decided on a "case-

by-case basis." *Id*. at 1189. In each case, after the close of evidence, the trial court must determine whether the defendant "produced enough evidence of causation" to support an instruction on the mitigation-of-damages defense. *Id*. In answering that question, the court should consider whether the medical issue is within the "common experience, observation, or knowledge of laymen." *Id*. (citation omitted). "If it is, and the defendant has produced competent non-expert evidence of causation," then the lack of expert testimony "does not preclude an instruction on failure to mitigate." *Id*.

C

Last, we consider whether the court below erred by instructing the jury on the failure-to-mitigate defense. Humphrey's only objection is that the instruction is not supported by the evidence. We disagree and hold there was no error because the instruction finds support in this record.

Here, as in *Willis*, the failure-to-mitigate defense is based on Humphrey's having ignored the advice of his treating physician. Humphrey concedes there is evidence on the defense's first element—namely, that he did not exercise reasonable care to mitigate his post-injury damages. *Willis*, 839 N.E.2d at 1188. But on the second element, Humphrey argues that Tuck and U.S. Express failed to offer evidence that Humphrey's lack of reasonable care caused him greater injury than he would have suffered had he followed his doctor's orders. According to Humphrey, no one—neither medical experts nor lay witnesses—testified that his ignoring his physician's advice "increased his harm" by any identifiable, quantifiable amount. The issue, though, is not only whether Humphrey's failure to follow orders "increased" his harm but also whether it prolonged the suffering of which he complains—and which he attributes to defendants' negligence—in any discrete, measurable way.

Recall that Humphrey's theory of the case is that a preexisting pituitary tumor became "apoplectic"—it swelled—due to trauma from the accident. According to Humphrey, the trauma caused physical symptoms for which he sought damages, including "acute vision loss" and elevated prolactin levels that led to truncal obesity, fatigue, and low libido. On the issue of damages, defendants argued that to the extent their negligence harmed

Humphrey, he did not exercise reasonable care in mitigating that harm. And they pointed to evidence in the record that Humphrey's own failings either aggravated his injuries or prolonged them. In other words, defendants say, Humphrey would have suffered less had he done more.

We agree with Tuck and U.S. Xpress that there was sufficient evidence to support instructing the jury on their defense of failure to mitigate damages. As to Humphrey's vision, he testified that he had no vision problems before the accident. Since the accident, he complains of vision problems that, he says, limit his ability to drive a vehicle; make it harder for him to see at night, especially if it is raining; and affect his ability to read signs and see peripherally. Yet even with these vision issues, Humphrey has not worn corrective eyeglasses or contacts—despite having a prescription for glasses that he never filled. For the past year, he did not return to the optometrist to get a new prescription, despite acknowledging that new glasses "may" help his vision. And he conceded that he made an appointment to see an optometrist about getting new glasses for his eyesight. Under our minimal standard for instructing the jury, this is enough evidence to allow a lay jury to consider whether Humphrey's vision would have improved had he either filled an existing prescription for eyeglasses or obtained a new prescription.

As to Humphrey's hormonal imbalance, the record shows that Dr. Stachura prescribed bromocriptine to reduce Humphrey's prolactin level. This level, if left untreated, can cause or exacerbate testosterone-related issues, including the low-energy issues of which Humphrey complains. Yet Humphrey did not immediately begin taking bromocriptine. Later, when he took it consistently, "his prolactin levels had decreased significantly." *Humphrey*, 132 N.E.3d at 516. But Stachura also testified that Humphrey stopped taking the bromocriptine because of nausea, that Humphrey was told to follow up to fix the problem, but that he did not. Once Humphrey eventually began the alternative treatment of testosterone injections—a year and a half after stopping the bromocriptine—his symptoms improved. When asked on cross-examination whether the testosterone injections were helping, Humphrey said they "help[ed] in a lot of ways", and that he had already noticed improvement. As with Humphrey's vision, this evidence, viewed most

favorably for defendants, would allow a reasonable juror to conclude that Humphrey's continuing symptoms qualified as an identifiable harm attributable not to defendants' negligence but to his failure to follow his doctor's orders. No more is required to instruct the jury.

Our opinion in *Willis* teaches that a defendant is entitled to a failure-to-mitigate instruction if the evidence would support a finding that the plaintiff's own actions or omissions failed to mitigate his own harm by any "quantifiable amount or specific item." 839 N.E.2d at 1190. The requirement of a "quantifiable" harm does not mean the defendant must prescribe a specific numerical value to the plaintiff's increased or prolonged harm. The respective burdens on plaintiffs and defendants are symmetric—a defendant's burden is no greater than a plaintiff's. Just as Humphrey did not need to quantify his request for damages to any degree of mathematical precision, neither did Tuck and U.S. Xpress need to do so on their defense. In both cases, it was up to the jury to determine whether, and to what extent, Humphrey was injured due to the defendants' negligence and, likewise, whether, and to what extent, Humphrey failed to mitigate his own damages.

*       *       *

For these reasons, the trial court did not abuse its discretion in giving the failure-to-mitigate instruction. Thus, we affirm its judgment, including its denial of Humphrey's motion to correct error.

Rush, C.J., and David, Massa, and Goff, JJ., concur.

ATTORNEY FOR APPELLANT

Michael W. Phelps
Phelps Legal Group
Bloomington, Indiana

ATTORNEYS FOR APPELLEES

Michael B. Langford
R. Jay Taylor, Jr.
Scopelitis, Garvin, Light, Hanson & Feary, P.C.
Indianapolis, Indiana